NOTICE

Decision filed 02/23/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250791-U

NOS. 5-25-0791, 5-25-0792, 5-25-0793 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ELLIOTT A., KADE N., and LEXY R., Minors | ) ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) ) | Shelby County. |
| Petitioner-Appellee, | ) ) | Nos. 22-JA-17, 22-JA-18, 22-JA-19 |
| v. | ) ) | |
| Kelsey A., | ) ) | Honorable Allan F. Lolie, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Barberis and Bollinger concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's judgment terminating the respondent's parental rights was not against the manifest weight of the evidence where the State met its burden of proving that the respondent was unfit to parent and that termination was in the best interest of the minor. Therefore, the judgment of the circuit court is affirmed.

¶ 2     The respondent, Kelsey A. (Mother), appeals from the September 3, 2025, order of the Shelby County circuit court terminating her parental rights over three of her minor children. On appeal, Mother challenges both the finding of unfitness and the determination that it was in the minors' best interests to terminate her parental rights. For the reasons explained below, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      This case began on August 31, 2022, when the State filed three petitions for adjudication of wardship regarding Mother's minor children.[1] The petitions alleged that the children, then aged eight, two, and one, were neglected by reason of an environment injurious to their welfare. 705 ILCS 405/2-3(1)(b) (West 2022). Specifically, the State alleged that the children were home with Mother while methamphetamine and cocaine were present on the kitchen table, accessible and within the reach of the minors. There were also unsecured firearms located in the home that were accessible to the minors, including a semi-automatic rifle and three sawed-off shotguns. Furthermore, the two-year-old minor was found by law enforcement outside of the residence, naked and underneath a vehicle, while Mother was sleeping or passed out in a back bedroom. The petitions named Mother as the minors' mother and listed each minor's father as unknown.[2] The State also filed petitions for shelter care for each minor. The circuit court entered temporary custody orders in all three cases on September 1, 2022, and named the Department of Children and Family Services (DCFS) as their temporary guardian.

¶ 5                    A. Adjudication of Neglect and Initial Proceedings

¶ 6      On March 22, 2023, the circuit court held an adjudicatory hearing, at which Mother stipulated to the allegations in the State's petitions. The circuit court entered an adjudicatory order the same day, finding the minors to be neglected and Mother to be the offending parent. After a dispositional hearing on June 7, 2023, the court entered a dispositional order making the minors

---

[1]A fourth petition, regarding Mother's oldest child, was also filed. That case was closed following the dispositional hearing, with the circuit court placing the child in the custody of his father, who was found to be fit, able, and willing to parent the minor. As the present appeal does not involve this fourth case, we discuss only the remaining three.

[2]The father of each minor was identified and given notice prior to the shelter care hearing. One of the three appeared, with counsel. All three appeared, with counsel, at the subsequent adjudicatory hearing. As none of these individuals are parties to the appeal, we limit our discussion to Mother.

wards of the court and granting custody and guardianship to DCFS. The circuit court found that Mother was unfit, unable, and unwilling to parent the minors based on her failure to correct the conditions that led to their removal, failure to engage with her recommended services, failure to regularly attend visitation, and her lack of a stable living situation.

¶ 7 On July 2, 2024, the State filed a petition for termination of parental rights in each minor's case. The State alleged that Mother was an unfit parent on the bases of (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare; (2) habitual drunkenness or addiction to drugs lasting at least one year before the fitness hearing; (3) failure to make reasonable progress toward the return of the minors during the nine-month period from September 12, 2023, to June 12, 2024; and (4) the existence of evidence that Mother intended to forgo her parental rights.[3]

¶ 8 DCFS filed a permanency report with the court on July 3, 2024. The report included a summary of the August 2022 incident, which formed the basis for the State's petitions for adjudication of wardship, as well as a summary of a second incident, which took place in October 2022. There, Mother mentioned on a recorded call with her then-husband, a federal inmate, that one of her children had swallowed suboxone, which she thought the child might have found in the door of Mother's car.

¶ 9 DCFS wrote that Mother's service plan included parenting education, mental health counseling, substance abuse services, cooperating with DCFS, personal stability, and visitation. DCFS referred Mother to weekly parenting courses. Between January 2023 and June 2024, she had attended seven sessions. Mother was rated unsatisfactory regarding parenting education as she had not been able to demonstrate parenting outside of a supervised visitation room at DCFS's

---

[3]The State withdrew this fourth argument during the fitness hearing.

offices. Despite the case being almost two years old, DCFS had no current plans to allow for visitation in the home.

¶ 10    Mother was also unsatisfactory on mental health assistance, as she was not currently engaging in those services. She had completed several mental health assessments and was deemed not to be in need of services. However, the report noted that Mother was not truthful in the assessments, and the evaluators did not have the information from DCFS about why the case had been filed. DCFS indicated to Mother that, despite these assessments, she still needed to complete mental health services "based on her personal choices and combativeness." Mother needed to notify DCFS prior to any further assessment so that the agency could inform the treatment provider why services were necessary. In November 2023, Mother told DCFS that she was engaged in counseling services. This could not be confirmed, however, as Mother did not provide DCFS with a signed release or an updated mental health assessment, treatment plan, or provider contact information.

¶ 11    Regarding substance abuse, Mother was arrested for possession of methamphetamine in February 2023; she denied the drugs were hers. She also had a history of DUIs, which DCFS noted she had failed to mention in any substance abuse assessment. Mother completed an intake appointment in April 2024 but refused to submit to drug testing. She was not recommended for further services because she self-reported that she had not used any substances within the last year. Mother later reported that she had "relapsed" on methamphetamine in June 2024.[4] Between September 2023 and June 2024, Mother was sent for nine random drug tests. She only appeared for two, in January 2023 and May 2024; both were negative.

_____

[4]DCFS noted in the report that Mother chose to use the word "relapse" because she maintained that she had not used methamphetamine in years.

¶ 12    The report described Mother's visitation with her children as going "okay." She missed "minimal" visits. Her visitation was supervised and took place at the DCFS offices. In terms of personal stability, by June 2024, she had not provided DCFS with any pay stubs showing her employment and appeared not to be working. The report also indicated that she had a history of falsely reporting her employment. She also had a warrant for her arrest, which had been pending since February 15, 2024. At the end of its report, DCFS recommended that the permanency goal be changed to substitute care pending termination of parental rights.

¶ 13    A subsequent permanency report, filed on August 30, 2024, indicated that Mother had completed a portion of the parenting curriculum and was applying what she had learned in the classes to her visitation. However, DCFS had no current plan to move visits to her home because it was reported that a known criminal was present there, and there was substance use taking place in the home. Despite her progress in the area of parenting, Mother was rated unsatisfactory on this service due to the length of the case and the fact that visitation still did not occur at home.

¶ 14    Mother was not engaging in mental health services. She checked into treatment for substance abuse on August 12, 2024, but left a few days later. She informed DCFS that she intended to return later that month but did not. Her visitation was reported as continuing consistently with the prior reporting. Regarding personal stability, Mother reported that she was employed, but this was again found to be untrue, and she did not submit any proof. Mother also reported that she was not in a relationship, but earlier that year, she was in a relationship with a known criminal.

¶ 15    DCFS filed a service plan on September 3, 2024, in which it listed the action steps that Mother was required to take. Regarding substance abuse, she needed to complete an assessment that satisfied the requirements DCFS had previously explained to her and follow all

5

recommendations stemming from the assessment. She further needed to submit to random drug screens and refrain from using illegal substances. DCFS rated Mother unsatisfactory on each of these components. Next, while she had completed parenting education and behaved appropriately during visitation, she was still rated unsatisfactory for parenting services as it was reported that she could "continue to learn and benefit" from parenting education. Mother also needed to complete a mental health assessment and provide honest answers, as well as follow any subsequent treatment recommendations. DCFS rated her unsatisfactory on mental health services. Regarding stability, Mother did have a home that DCFS deemed suitable for placement, but she still did not report any income or employment. She also reportedly had a boyfriend but had not provided DCFS with his information so that he could be evaluated.

¶ 16                                B. Fitness Hearing

¶ 17    The circuit court held a fitness hearing on July 9, 2025. DCFS employee Amy Schroeder testified for the State, explaining that she was assigned to the case in October 2022 and became the case supervisor in September 2023. She went over Mother's August 2023 service plan, as well as Mother's engagement with those services.

¶ 18    Mother completed a substance abuse evaluation, but DCFS requested that she complete another, due to information that she had not been forthcoming on that evaluation. She occasionally missed drug tests, citing a lack of transportation. However, Schroeder testified that DCFS scheduled the majority of her drug tests on the days when Mother was present in the offices for visitation. Mother attended visitation regularly; however, she still missed drug tests on the days she was already at the DCFS office for visitation. According to Schroeder, Mother never successfully completed substance abuse treatment while Schroeder was assigned to her case.

6

¶ 19    On parenting, Schroeder testified that while Mother had completed a pre-test, she was rated unsatisfactory overall due to her inconsistent engagement with parenting services. Schroeder added that, because of this inconsistency, Mother was not able to satisfactorily implement what she was learning in parenting education during the time spent with her children at visitation.

¶ 20    Regarding mental health, as with her substance abuse services, Mother was required to undergo a new assessment due to not being forthcoming at her initial evaluation. Again, she had not undergone a subsequent evaluation. There were also concerns over a recent incident in which police were called to Mother's home because she was making threats of harming herself. Schroeder stated that Mother did not report this incident to DCFS. At the time of the service plan, DCFS was unable to verify whether her housing was safe and stable, and she had not provided any proof of legal income, despite claiming to be working.

¶ 21    Regarding communication and cooperation with DCFS, Schroeder testified that Mother had times during which she kept in contact and provided the agency with information as needed. Mother was rated unsatisfactory on this point because she had never remained consistent in her communication over any six-month period. Schroeder was also advised by her supervisor not to meet with Mother alone in her home due to her hostility and combative nature. Meetings, therefore, took place only in the DCFS offices. Schroeder stated that Mother had a weekly two-hour supervised visitation at the offices, and her attendance was good.

¶ 22    DCFS employee Kara Morris also testified for the State. She said that she had been the minors' caseworker since September 16, 2023, and she testified to a permanency report filed in advance of a December 6, 2023, hearing. At the time of the report, Mother was rated unsatisfactory on parenting services because she stopped attending after six sessions. She claimed to be engaged in counseling but had not completed a mental health assessment and did not provide a release for

7

DCFS to confirm her treatment. She also had not complied with DCFS's instructions to undergo another substance abuse evaluation and failed to appear for multiple drug tests.

¶ 23 Mother was engaging in visitation, which was going well. Morris testified that she was unable to inspect Mother's home during the time covered by the report and thus could not confirm her personal stability. She also stated that Mother's communication was inconsistent—she sometimes responded with silence and at other times became combative.

¶ 24 Morris also testified about a permanency report dated January 10, 2024, filed shortly after the previous report. Morris explained that Mother's overall engagement with services remained the same. Mother completed a substance abuse assessment later in January 2024, which was reflected in her January 31, 2024, service plan. However, at that time, she was still rated unsatisfactory on all services, as she was not following her recommendations for substance abuse and mental health treatment, had not completed parenting education, and had not addressed DCFS's concerns regarding her personal stability and communication.

¶ 25 Morris was not able to conduct an inspection of Mother's home until April 10, 2024, due to the presence of unknown individuals at her home on every prior attempt that Morris made. Morris testified that she determined the home to be appropriate, but that she did not conduct a home safety check during that visit. This was because DCFS was informed that there were third parties who were often present at the house who could pose a danger and because of Mother's own pending criminal charges.

¶ 26 Next, Morris testified regarding a permanency report dated April 10, 2024. By this time, Mother had completed her parenting course. However, the educator had concerns regarding Mother's ability to implement parenting skills. Mother had not completed any mental health counseling and was not engaging in any counseling. The same failure to complete services applied

8

to substance abuse treatment. She also did not complete the hair follicle panel requested by DCFS. She did not produce any proof of employment and denied being in a relationship despite DCFS's information to the contrary.

¶ 27    Morris further testified that Mother had completed a substance abuse assessment in May of 2024 but had not completed the services recommended from that assessment by the date of her August 15, 2024, service plan. Mother also admitted to using methamphetamine that August and continued to miss drug tests. Mother still had not completed parenting services, and she was inconsistent in applying the skills she had learned. She was therefore rated unsatisfactory on parenting. By May 2024, Mother had successfully completed a mental health assessment but had not started the recommended treatment or signed any releases for information. Accordingly, DCFS rated her unsatisfactory on this point as well.

¶ 28    After Mother divorced the individual with whom she had been living, DCFS rated her satisfactory on maintaining a stable home. However, Mother reported that she was dating someone but did not provide his information for DCFS to vet him. Mother still had not provided DCFS with any proof of income and continued to lie about being employed. Her communication with DCFS was also inconsistent.

¶ 29    Morris next testified about a permanency report dated August 15, 2024, at which point Mother's performance remained the same. Morris stated that at the time of the hearing, Mother had not successfully completed any services. After the first visit to Mother's home in 2024, Morris had been unable to visit her on any other date. Despite informing Mother of when Morris was coming to visit Mother's home, there were always other people present at her home when Morris arrived. Morris explained that for safety reasons, she could not go into the house if any unknown individual was inside. Morris also testified that Mother had been requested to complete 33 drug

9

tests over the course of the case, of which she only completed 7. Her last test, in March of 2025, was negative. Regarding visitation, Mother remained consistent with her visits.

¶ 30    Mother also testified. She stated that she lived alone and was self-employed. She maintained that she was employed at Sarah Bush Hospital in September of 2023, as she had told DCFS, and she claimed that no one ever asked her to submit a pay stub. She added that she was fired from this position for missing work and being late due to a lack of transportation. She further testified that she started going to school for automotive technology in the spring of 2023, while also working. Mother's current self-employment was in the automotive technology field. She also stated that she never saw any of her service plans and never signed any of them. Mother testified that when DCFS told her about her services, it was always over the phone.

¶ 31    Mother testified that she took a substance abuse assessment, and it did not recommend any treatment. She took a second assessment at DCFS's request and again was not recommended for any treatment. However, she said she was already in treatment for substance abuse, because she was taking suboxone, and was required to pass a drug test and attend counseling whenever she picked up her prescription. She added that she informed DCFS of this treatment. She discontinued taking suboxone around March of 2024 but did not recall whether she continued to attend the counseling and drug testing. Mother further testified that she voluntarily attended additional drug tests, outside of those ordered by DCFS, at a different location because she lacked transportation to attend DCFS's tests.

¶ 32    Regarding mental health services, Mother said that she took an assessment and was not recommended any treatment. However, she was attending counseling and claimed that DCFS never asked her to sign a release. Mother also testified that she had not pled guilty to any of her pending criminal charges and was consistent in her visitation unless she lacked transportation.

¶ 33    On cross-examination, Mother testified that the last time she used methamphetamine was in August of 2024, after which she went to rehab. However, the facility released her because she was not deemed suitable for inpatient care. She was instead attending outpatient treatment, as per her prior testimony. She also acknowledged that she was recommended services following her latest substance abuse assessment in 2024, which she claimed she attended, although she did miss some appointments. Mother was also asked about a psychiatric hospitalization she had in May 2025. She testified that she was not given any treatment plan upon her release from the hospital.

¶ 34    The circuit court then heard argument. The State argued that the case was opened in 2022, and Mother had yet to complete mental health counseling or the eight-week substance abuse program for which she was recommended after finally successfully completing a substance abuse assessment. She also admitted that the last time she used methamphetamine was in October of 2024. Regarding parenting, she completed six classes but still had more to go before completing parenting services. The State also noted that Morris had testified that she reviewed the service plan with Mother at every team meeting and would mail a copy to her each time for her signature; however, Mother never sent back any signed copies. As for Mother's lack of transportation for drug tests, the State argued that she was able to attend visitation, as well as the out-of-town program through which she received suboxone. The State noted that Mother only attended 7 out of 33 drug tests over two years.

¶ 35    Mother's counsel argued that Mother loved her kids, that she completed the required substance abuse and mental health assessments, and that DCFS only instructed her to take further assessments because they were "frustrated" that the results came back without any recommendation for services. Mother had testified that she was willing to do any services she

11

needed had the results been otherwise. Counsel asked the circuit court that Mother be given additional time to complete her services now that she was aware of what they were.

¶ 36 Counsel added that Mother had actually completed her parenting courses and had a certificate of completion. The State informed the circuit court that DCFS had not received any certificate, and the circuit court stated that because the certificate was not presented to the court, it would not be considered. The circuit court then took the matter under advisement.

¶ 37 The circuit court issued a written order on July 24, 2025, finding that the State had met its burden of showing that Mother was an unfit parent by reason of failure to maintain a reasonable degree of interest, concern, or responsibility in the children's welfare, and failure to make reasonable progress during the nine-month period from September 12, 2023, to June 12, 2024. The court found that the State had not met its burden regarding its third allegation, habitual drunkenness or drug addiction, an argument that the State had conceded it had not proved.

¶ 38 In explaining its decision, the circuit court acknowledged that DCFS caseworker Amy Schroeder only testified to a few days of the relevant period for lack of reasonable progress; thus, the court considered her testimony only for its finding as to the first basis for unfitness. On that point, the circuit court noted Schroeder's testimony that Mother failed to appear for multiple drug tests, despite attending most visits, which were very close by and on the same days. Morris testified to the same, stating that Mother missed 26 out of 33 tests. The court therefore found that Mother was "clearly avoiding" drug testing.

¶ 39 The circuit court added that DCFS required Mother to re-take her substance abuse assessment because it was determined that she was not honest with the evaluator about her criminal history and prior drug use. She was similarly required to re-take a mental health assessment due to her lack of honesty. Mother additionally admitted to using methamphetamine in August of 2024.

12

The court recognized that relapse was a part of addiction recovery, but found that not to be the case here, where Mother never completed substance abuse counseling nor fully engaged in treatment. The circuit court made a similar finding regarding Mother's May 2025 hospitalization for her mental health, stating that she never fully engaged in treatment throughout the case.

¶ 40 Regarding her employment, the circuit court found that Mother's claim of being employed at Sarah Bush Hospital was not credible, as she never provided any pay stubs or other proof of income, and she could not provide a clear time period for her employment there. The court further found Mother to lack credibility when she testified that DCFS never asked her for pay stubs or for signed releases for her alleged mental health or substance abuse treatment.

¶ 41 The circuit court also noted that Morris testified that Mother was uncooperative and combative during their meetings. The court found Morris to be credible. The court further explained that if Mother desired the return of the minors, she would cooperate with DCFS and do whatever was asked of her. Based on her lack of cooperation, as well as her failure to engage with substance abuse or mental health services, the circuit court found that Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare.

¶ 42 Turning next to her failure to make reasonable progress during the relevant period of September 12, 2023, to June 12, 2024, the circuit court reiterated its aforementioned findings and added that at no time during the case had Mother made reasonable progress on her substance abuse and mental health services. The circuit court further found that Mother had access to the required services and was advised of the requirements in her service plan. To the extent that Mother testified to the contrary, the court found her to lack credibility. Therefore, the circuit court determined that Mother was unfit to parent the minors and set the matter for a best-interest hearing.

13

¶ 43                    C. Best-Interest Hearing

¶ 44    DCFS filed a best-interest report on August 25, 2025, in advance of the hearing. According to the report, 11-year-old Lexy R. was placed with her paternal grandmother and was doing well in this placement. She was in the fifth grade and had no behavioral concerns. She was healthy and was up-to-date on medical appointments. She and her grandmother shared a strong bond, and the child was well cared for. Her grandfather was also an integral part of her life, and she loved spending time at his house.

¶ 45    Five-year-old Kade N. was placed in a relative placement with David and Angie Woods. He was bonded to them and called them "mom" and "pawpaw." He was adjusting well to the foster home, loved participating in family activities and being a helper, and was up-to-date on all medical appointments. He was in kindergarten and receiving therapeutic and behavioral intervention due to difficulty regulating his behavior. He was referred for psychological testing for suspected autism.

¶ 46    Four-year-old Elliott A. was in a fictive kin placement, in the same home as Lexy R. He was doing well and very bonded to his foster mother and his sister. He was seeing an ophthalmologist for an eye condition attributed to his neonatal substance exposure but was otherwise in good health and was up-to-date on medical appointments. He attended pre-kindergarten, and was an active, playful child with no other concerns.

¶ 47    The report also stated that Lexy and Elliott's foster mother had signed a permanency commitment for both children, who had been living with her since October of 2022. Lexy's father completed a direct surrender to the foster mother for Lexy. The foster mother was willing, wanting, and prepared to adopt both children. She had stable housing, a reliable vehicle, and provided them with food, clothing, and shelter. She also shared a bond with the children and loved them very

much. Kade's foster parents, the Woodses, also signed a permanency commitment form and were very bonded to him. They loved and cared for him and made sure all of his needs were met. Kade was placed with them in October of 2022.

¶ 48　Regarding the minors' relationships with Mother, the report stated that Lexy loved her mother but "accepted that she does not always make safe choices." Lexy had anxiety as a result of the care her mother rendered, and, for this reason, did not wish to be in Mother's care. Lexy declined visitation on a few occasions, and when she did visit with Mother, the child did not appear bonded or attached to her. Lexy expressed feeling ignored by Mother and believed that Mother's focus was more on the two younger children. Lexy had expressed not wanting to return home and a desire to remain with her grandmother.

¶ 49　The report noted that Kade and Elliott were very young when they were removed from Mother's care, and were more bonded with their foster parents, with whom they had spent most of their lives. They did call Mother "Mom" when she visited, although Kade referred to her as his oldest brother's[5] mom. Elliott did not identify Mother as a primary caregiver, although he did recognize that she is his mother. Outside of visitation, neither child asked about Mother, nor did they ask about going home with her. While both children interacted with Mother during visitation, it was more as play-time rather than bonding or attachment.

¶ 50　DCFS concluded in its recommendation that the circuit court find it in the children's best interests to terminate Mother's parental rights and set permanency goals of adoption in all three cases. DCFS opined that Mother still had not corrected the conditions that led to the children's removal, remained unable to provide a safe environment due to her ongoing substance abuse and

[5]This was the fourth child involved in the termination proceedings against Mother. As previously mentioned, his case is not a part of this appeal.

mental health issues, and had taken no accountability for what brought her children into care. Unless she was able to take accountability, identify the areas she needed to work on, and stop blaming others for her own lack of engagement, DCFS considered it "unlikely" that Mother would be able to correct the conditions that led to the children's removal, even if given additional time to do so.

¶ 51    DCFS also filed a service plan dated August 19, 2025, which indicated that Mother was still rated unsatisfactory on substance abuse services, for her continued failure to appear for random drug testing or to consistently attend substance abuse treatment. Her progress on parenting services remained the same, and she was rated unsatisfactory for failing to demonstrate the skills she learned outside of visitation at the DCFS offices or show that she was safe to parent outside of this supervision. She continued to not engage in mental health treatment and was again rated unsatisfactory for mental health services. She still had not provided DCFS with any proof of income and refused to sign releases of information or inform DCFS of her relationship status. The safety concerns that prevented caseworkers from visiting her in her home also remained an issue. Mother was therefore rated unsatisfactory on personal stability and on cooperating with DCFS.

¶ 52    The circuit court held a best-interest hearing on September 3, 2025. DCFS caseworker Kara Morris testified for the State, speaking to the minors' foster placements. She confirmed what she wrote in the DCFS best-interest report, stating that all three minors were doing well in their respective foster placements and very bonded to their caregivers. Morris had been to the home of Lexy and Elliott's foster mother, and found it to be very clean and appropriate, and she observed that each child had their own bedroom. The foster mother had a partner, on whom DCFS conducted a background check. Morris noted that Elliott called him "Dad" and went to him if he needed something. She described the relationship between the partner and both children as appropriate.

16

Morris added that the foster mother was 50 years old, and her age was not a concern for adoption. The foster mother had also completed everything required by DCFS, maintained good contact with the agency, and was willing to adopt Lexy and Elliott.

¶ 53 Morris also testified that the children currently had sibling visits facilitated by DCFS. If the children were adopted, DCFS could not mandate that contact between the siblings continue, but the agency would provide the respective foster parents with each other's contact information in the hopes that the families would make these arrangements. The two foster homes were approximately 45 minutes apart. Morris explained that there was no relative available to foster all three children together. Morris did not know of any religious or cultural issues that Mother may have regarding her children, and she was not aware of whether the children attended church. She further testified that the children were doing well in school, and all of their educational needs were being met.

¶ 54 Kade was living with his paternal grandmother and her husband. He attended a specialized school and received counseling to address his behavioral issues and was doing well so far. Morris also observed him in the foster home and said that his foster parents were able to adequately deal with these issues. He was also thriving in the home environment.

¶ 55 Morris also testified about visits between Mother and the minors. Although she stated that it had been some time since she last observed such visits, she reviewed the reports from the more recent visits. Morris explained that visits were not occurring at Mother's home because her home was not suitable for visits, based on her outstanding services, and because DCFS did not know who might be around the home. She explained that family members of Mother had told Morris about some of the people with whom Mother associated, and Morris believed them to be a safety risk.

17

¶ 56    Morris stated that she observed Mother behaving appropriately during visitation, bringing appropriate toys and snacks, and asking Morris to pass along birthday wishes to the children. Lexy and Elliott referred to her as "mom" and Kade referred to her as his older brother's mom. Morris had observed the children going to Mother for comfort during visitation. Lexy had opted to not attend a "handful" of visits, which Morris explained was due to feeling left out and ignored by Mother in favor of her younger brothers. Morris opined that the children could achieve permanency in their current placements.

¶ 57    Next, David Woods testified, explaining that he was Kade's step-grandfather and foster father. He said that Kade referred to him and his wife as "Pawpaw" and "Mom," respectively, and referred to Mother as his brother's mom. He also testified about how he and his wife were managing Kade's behavioral issues, as well as the special schooling he received because of his learning disabilities. David also spoke about how much Kade enjoyed helping out around the Woodses' farm. David further stated that he loved Kade, had grown attached to him, and would adopt him if that option were available. He added that he could financially support him, and spoke of his and his wife's employment, adding that they had a family friend babysit Kade when needed. David stated that he intended for Kade to remain in contact with his siblings; however, on cross-examination, he testified that he had not made any efforts at that time to facilitate the siblings' meeting together.

¶ 58    Angie Woods, Kade's foster mother, also testified. She explained that she was biologically related to Elliott, as the mother of Elliott's biological father, but had no biological relation to Kade. When she took Kade into her home, the other two children had already been placed in their current foster home, and there was no discussion of her taking either of them as well. Angie's son, while not Kade's biological father, originally intended to become Kade's legal father, but was unable to

18

care for him. Angie testified that she loved Kade "wholeheartedly," and she intended to adopt him if possible. On cross-examination, she stated that she and her husband had voluntarily arranged for the siblings to see each other outside of the meetings scheduled by DCFS on two occasions.

¶ 59   Mother testified that she lived alone, in a house with adequate space to allow Lexy to have her own room, and for the two boys to share a room. She said that she had not spoken to her ex-husband, who was a convicted felon and known drug user, in a year and a half. Their marriage was terminated on March 5, 2024. Mother further testified that she was employed and did automotive work on the side. She said that she earned enough money to be able to support her children. She also stated that she was currently clean of drugs and alcohol, and that she had records of at least a year's worth of drug tests she had taken outside of the testing ordered by DCFS. Mother added that all of the tests were negative, and that it was important to her to remain clean for her children.

¶ 60   Mother spoke about the three minors and the relationship she had with them. She also explained that she was the primary caretaker of all three children, as their fathers were not in their lives. She also stated that the minors always played together when they lived with her and had strong sibling bonds, so it was important that they remain close. She spoke about her visitation, saying that she only missed visits due to illness or lack of transportation, and that visits generally went well. She listed other family members of hers with whom the minors were close and said that they rarely got to see these individuals while in their foster placements. She expressed love for her children and said that she was still willing to take drug tests and remain sober for them.

¶ 61   On cross-examination, Mother was asked why she believed Lexy had at times refused to come to visits. Mother answered that Lexy refused to attend four or five visits over the summer because she wanted to go to the pool, and that both Lexy and her foster mother told her this was the reason. She also testified to her intentions of regaining custody over a fourth minor, her oldest

19

son. She said that she saw him often and financially supported him. She provided the name of her current boyfriend but denied knowing that he had four pending drug charges.

¶ 62    Lastly, Tonya Homer testified for Mother. She said that she had known Mother her entire life and was a daycare provider for her kids. Homer explained that she had watched Lexy, Kade, and Mother's oldest son[6] on weekdays while Mother was at work and was able to observe Mother interacting with her children during drop-off and pick-up. Homer described her as a good mom, with well-behaved children, and denied ever seeing anything inappropriate or having any concerns about Mother's care for her children.

¶ 63    At the conclusion of argument, the circuit court stated its findings. Regarding Mother, the circuit court found that she was "not near ready" for the minors to be returned to her. Applying the statutory best-interest factors to each minor individually, the court first found that the unrebutted evidence showed that Lexy was safe and cared for in her grandmother's care. She had been living with her grandmother for approximately three years and had expressed a desire to remain there. She was doing well in school and had a suitable home. The circuit court also noted that she was placed with a family member. While the foster mother did not testify, the court heard Morris's unrebutted testimony and reviewed DCFS's report, which indicated that the grandmother wanted to adopt her.

¶ 64    The circuit court turned next to Elliott, who was also placed with Lexy's grandmother, and lived with his half-sister. While the evidence did not contain any indication of his express desires, the court noted that he did not appear to be bonded to Mother, and he had been in care for three out of his four years. The circuit court found that he would have permanency in his current placement, and even though he was not placed with any of his biological relatives as caregivers,

---

[6]This was before Elliott was born.

the court determined that there was no risk in keeping him in this placement. Finally, as with Lexy, the foster mother wanted to adopt him.

¶ 65 Lastly, the circuit court noted that Kade was placed with his legal grandmother and was safe and cared for in this placement. Again, the unrebutted evidence showed that he was bonded to his foster family and had adapted well to their home, and there was no evidence that he was bonded to Mother. He had also been in care since a very young age. The circuit court further found that Kade was thriving at home despite his behavioral and learning issues. He was also the only child in the foster home, which the court noted allowed him to receive the special attention he needed. The circuit court also determined that permanency was especially important for Kade, as his removal from the placement where he had lived for three years could have serious effects on his behavioral condition. The Woodses testified that they wished to adopt him, and the unrebutted evidence showed that their home was suitable.

¶ 66 Thus, the circuit court concluded that it was in the best interests of all three minors that Mother's parental rights be terminated. On September 3, 2025, following the best-interest hearing, the circuit court entered a judgment terminating Mother's parental rights over the three minors for the reasons stated on the record. In addition to its finding, by a preponderance of the evidence, that termination was in the children's best interests, the court stated in its order that the State had proven by clear and convincing evidence that (1) respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare and (2) respondent failed to make reasonable progress toward the return of her children during the nine-month period of September 12, 2023, through June 12, 2024. Thus, she was an "unfit person" within the meaning of section 1(D)(b) and (D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(m)(ii) (West 2024)). This appeal followed.

21

II. ANALYSIS

¶ 68    On appeal, Mother argues that the circuit court's findings that she was an unfit parent and that termination of her parental rights was in the best interests of the minors were against the manifest weight of the evidence. We disagree.

¶ 69                    A. The Circuit Court's Finding of Unfitness

¶ 70    A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re Gwynne P.*, 215 Ill. 2d at 354. Pursuant to the Juvenile Court Act of 1987, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024); 750 ILCS 50/1(D) (West 2024). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 71    Here, the circuit court based its unfit-person ruling on a lack of reasonable interest, concern, or responsibility, and on a lack of reasonable progress. As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
> * * *
> (b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.

* * *

(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(b), (D)(m)(ii) (West 2024).

¶ 72 A finding of unfitness under subsection (D)(b) of this provision is based on a subjective analysis, which focuses not on the parent's success, but rather on the reasonableness of his efforts, taking into account his particular difficulties and circumstances. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Simply demonstrating some interest in or affection towards the child does not render a parent fit under this subsection; rather, his interest, concern, and/or responsibility must be reasonable. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Furthermore, "[b]ecause the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness." *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Unlike subsection (D)(m), subsection (D)(b) has no time constraint that limits our consideration of respondent's fitness. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Both noncompliance with a service plan and infrequent or irregular visitation with the child have been held to be sufficient evidence warranting a finding of unfitness under this subsection. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (quoting *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 73 Under the Adoption Act, "reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The Adoption Act provides guidance for measuring reasonable progress as follows:

"If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan ***." 750 ILCS 50/1(D)(m)(ii) (West 2024).

23

The benchmark for measuring reasonable progress encompasses "compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d 181, 208 (2001)).

¶ 74    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 75    On appeal, Mother argues regarding lack of reasonable progress that she completed parenting classes and substance abuse counseling and was "partially engaged in mental health counseling at times." She also alleges that she self-reported her employment and had a stable home that DCFS failed to approve "based on rumors rather than firsthand evidence of actual safety issues." Lastly, while admitting that her progress was partial and inconsistent, she argues that "[i]nconsistent progress is still progress."

¶ 76    As for the lack of reasonable interest, concern, or responsibility, Mother argues that she consistently attended visitation, and while she again admits that she was "less consistent in

24

complying with all the recommended services in the service plans," she argues that she nonetheless regularly attempted to engage in those services. She further contends that courts should consider a parent's efforts to visit and maintain contact with her children, as well as inquire into their welfare, in light of circumstances like poverty, transportation, and life events.

¶ 77    Addressing first the circuit court's finding pursuant to subsection (D)(b) of the Adoption Act, we initially note that the circuit court could consider evidence across the duration of the case and was not confined to any nine-month period as mentioned in subsection (D)(m). For this determination of unfitness, the circuit court heard testimony from two of Mother's DCFS caseworkers regarding her consistent failure to engage in mental health and substance abuse services, including missing the majority of her drug tests. Mother's argument primarily consisted of two points. The first point was that DCFS kept pushing her to undergo additional assessments after her initial evaluations did not result in any recommendations for services. The second was that she was receiving mental health and substance abuse counseling and passing drug tests through her own chosen providers, which were more accessible to her given her lack of reliable transportation.

¶ 78    Regarding her first point, the circuit court heard testimony that Mother was not forthcoming about the extent of her mental health and substance abuse issues in these assessments, and the evaluators were not provided with information about her case and why her children came into care. Mother admitted to using methamphetamine while the case was pending, as late as June or August 2024.[7] Prior to that, she was arrested for possession of methamphetamine in February 2023. She also required hospitalization for her mental health in May of 2025. The circuit court

---

[7]Both approximate dates appear in the record; August 2024 was when Mother attempted to go to rehab, but she was released before finishing treatment.

25

acknowledged that relapses happen in addiction recovery and was sympathetic to her mental health struggles. Contrary to Mother's argument on appeal, the court did consider her individual circumstances and challenges. See *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. However, the court ultimately found that these incidents were further indicators of her failure to engage in services.

¶ 79    The court additionally found that Mother was clearly avoiding drug testing, particularly in light of her caseworkers' testimony about her being uncooperative and regarding the scheduling of drug tests in conjunction with her visitation. However, Mother was able to secure transportation to most of her visits, including on days when she also missed a drug test scheduled for the same day. Furthermore, the location at which she claimed to be receiving counseling and drug testing was located outside of the town where she lived, thus also requiring transportation. The circuit court found Mother's testimony regarding transportation issues to lack credibility. We will not disturb that finding on appeal as we defer to the circuit court's determinations of witness credibility. See *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 80    Additionally, Schroeder and Morris testified that Mother never provided DCFS with any signed releases so that the alleged counseling she was receiving could be verified. The circuit court weighed this testimony against Mother's contention that she was never asked to sign anything and found the caseworkers to be more credible. We also note that, on appeal, Mother admits to her inconsistent and partial engagement in the services listed on her service plans. Furthermore, in terms of showing an interest, concern, or responsibility for the minors' welfare, it was particularly important for Mother to demonstrate that she could maintain her sobriety and keep drugs out of the home in light of the incident that led to the minors' removal.

¶ 81    Mother further needed to demonstrate that she could provide safe and stable housing and a source of legal income to support her children. The circuit court heard testimony about DCFS's

26

difficulty conducting a home inspection and Mother's consistent failure to provide any proof of income. While Mother testified that she was at times working two jobs and/or attending school to get an automotive technician certificate, the circuit court found the DCFS caseworkers' testimony to be more credible than Mother's regarding her employment status.

¶ 82 As for the home inspection, apart from one occasion, the circuit court was aware of why DCFS was unable to go into her home. Although DCFS had concerns about the people who Mother allowed into her home, there was no evidence presented that the home itself was unsuitable, nor did the circuit court rely on any such finding in rendering its decision on fitness. However, the situation relating to the home inspection did provide further indication of Mother's lack of cooperation with DCFS. Morris testified that she had tried to arrange times to visit Mother's home when no one else was present, but when she made these arrangements, people would be at Mother's house when Morris arrived. Additionally, Mother did not inform DCFS regarding who she was dating so that this individual could be vetted by the agency. Mother's lack of cooperation with DCFS regarding home visits was also a significant factor in preventing her visitation from being moved to her home.

¶ 83 The circuit court recognized that Mother did regularly attend visitation, and that there were no significant concerns about her behavior during visits. However, the circuit court ultimately concluded that if Mother had a reasonable degree of interest, concern, or responsibility for the minors' welfare, she would have made sure to cooperate with DCFS and do whatever was asked of her, especially in the areas of mental health and substance abuse treatment. See *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (explaining that simply demonstrating some interest or affection does not render a parent fit under subsection (D)(b); the interest must be reasonable). We thus agree

27

with the circuit court and find that its determination under subsection (D)(b) of the Adoption Act was not against the manifest weight of the evidence.

¶ 84    We turn next to the circuit court's ruling on the basis of a lack of reasonable progress. Here, the circuit court looked only at the evidence covering the nine-month period from September 12, 2023, to June 12, 2024. As a preliminary matter, we do not consider Schroeder's testimony and the related reports and service plans from her time on the case, as they did not take place during the relevant nine-month period. We will consider, as the circuit court did, the remaining evidence set forth above. The circuit court found that, at all times throughout the case, including the relevant nine-month period, Mother had access to and knowledge of the required services, and was not significantly hindered by financial or other obstacles. To the extent that she testified about not being informed of her service plan, the court found her to lack credibility. The circuit court further found that at no point during the case did Mother make reasonable progress on her substance abuse or mental health services, for the reasons mentioned herein. We agree.

¶ 85    Therefore, we find that the circuit court's findings at this stage of the termination proceedings were not unreasonable, arbitrary, and were consistent with the evidence presented. The evidence was sufficient to support a finding of unfitness. Thus, the court's determination that Mother was an "unfit person" pursuant to the Adoption Act was not against the manifest weight of the evidence.

¶ 86                    B. The Circuit Court's Best-Interest Finding

¶ 87    Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable,

28

loving home life." *In re D.T.*, 212 Ill. 2d at 364. At this stage of the termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 88 In making a best-interest determination, the court must consider several factors, within the context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2024). The factors are as follows:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

¶ 89 As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537 ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537 ¶ 33.

¶ 90 On appeal, Mother argues that the circuit court's ruling was against the manifest weight of the evidence because Homer testified that Mother was a good mother, that the children missed their mother while they were at Homer's daycare, and that they were excited to see her when she came to pick them up. Mother further contends that this demonstrated that the minors did have a bond with her, contrary to the circuit court's findings.

¶ 91 Here, we again reiterate that we defer to the circuit court's determinations of witness credibility, and its balancing of competing testimony. Mother testified that the children were

29

bonded to her and affectionate toward her, while Morris and the Woodses testified about how closely bonded the children were to their respective foster parents, particularly compared to their relationships with Mother. There was abundant, undisputed evidence that the children were all doing well in their foster placements, considered their foster parents their primary caregivers, and wished to remain in their placements rather than return to Mother. We also note that Homer's testimony about how the two older children interacted with Mother while they attended her daycare is of limited relevance as Homer's observations took place before this case was opened and the children were removed from Mother's home.

¶ 92    The circuit court reviewed all relevant statutory factors, applying them to each child individually, in rendering its best-interest decision. The oldest child was able to expressly state that she wished to remain with her foster mother, and there was evidence that the two younger children felt similarly. The goal of permanence would be best served by keeping the children in their foster placements, particularly where the two younger ones had been in care for most of their lives, and one child had special needs that might make a disruption to his current stability more challenging for him. There was also uncontroverted evidence that the foster families loved and cared for the minors, were able to provide for them, and wished to adopt them. Additionally, while not necessarily related by blood, all three minors were placed with some degree of relatives, thus maintaining family ties. While Mother questioned whether the foster parents would facilitate visits between the siblings, there was no evidence that the foster parents would not work to facilitate visits once DCFS had no further obligation to arrange such visits. According to DCFS, there were no risks with keeping any of the children in their foster placements.

¶ 93    In light of the testimony presented at the best-interest hearing, we agree with the circuit court that the State met its burden of proving by a preponderance of the evidence that it was in the

minors' best interests to terminate Mother's parental rights. We further find that the circuit court's determination was not against the manifest weight of the evidence where the evidence strongly supported a finding that the relevant statutory factors supported the circuit court's findings that termination of Mother's parental rights was in the best interests of the minors.

¶ 94                                    III. CONCLUSION

¶ 95     For the reasons stated, the circuit court did not err in terminating Mother's parental rights to the three minors who were the subject of the proceedings herein. The judgment of the circuit court is affirmed.


¶ 96     Affirmed.